hDECUIR, Judge.
CRB and RDL are the parents of GJL, a 10-year-old boy, and MML, a 7-year-old girl. The children have been in foster care since 1998, and the State filed a petition to terminate parental rights so the children could be freed for adoption. After a hearing, the trial judge concluded that the State failed to prove that termination of parental rights was in the best interest of the children and rejected the State’s petition. The State has appealed, and, for the following reasons, we affirm.
CRB and RDL do not live together and the evidence in the record does not indicate that they have maintained any type of relationship since their children were very young. The children’s mother, CRB, suffers from bi-polar disorder and is mildly mentally retarded. She does not have the cognitive abilities to provide day to day care for her children; for instance, she does not always have food in her house. She is married and was living with her husband at the time of trial, but they have separated several times. She also tends to make irresponsible financial decisions and moves residences frequently with no planning or forethought. However, it is undisputed that this mentally infirm mother loves her children and wants to be a part of their lives. The father, RDL, has a heart condition and cannot care for his children because of his physical infirmities. The condition of both parents is permanent.
The evidence also indicates that GJL and MML love their parents. The children are in separate foster homes and seem to be doing well. GJL is happy living with his foster mother, but he expresses concern about his parents and how they are getting along. He visits with his mother and sister regularly. He would also like to visit with and maintain a relationship with his father. GJL’s foster mother would like to adopt him; she will not, however, adopt MML. Thus, the brother and sister would be permanently separated, a situation that is certainly not ideal. MML is content and well-adjusted in her foster home. She is not as attached to her mother, CRB, as her L.brother is and at times has expressed no desire to continue a relationship with her father. MML’s foster parents do not wish to adopt her, apparently due to their age. While other persons have expressed an interest in adopting MML, the State had no particular plans for her adoption at the time of trial.
This court has previously recognized the fundamental concept that a child has the right to know and love his parents. In re Billeaud, 600 So.2d 863 (La.App. 3 Cir.1992). The natural rights between parents and their children are reciprocal, and should not be denied except when a parent has proven himself unworthy of his *793 child’s love. In re Adoption of B.G.S., 556 So.2d 545 (La.1990); In re Elliott, 93-750 (La.App. 3 Cir. 12/8/93), 630 So.2d 281; writ denied, 94-0076 (La.3/11/94), 634 So.2d 396. Parental rights give rise to a fundamental liberty interest and warrant great deference and vigilant protection under the law. State in the Interest of Q.P., 94-609 (La.App. 3 Cir. 11/2/94), 649 So.2d 512. Furthermore, because termination of parental rights is in derogation of the natural and fundamental liberties of the parent, proof of the grounds for termination must be proven by at least clear and convincing evidence. Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); La.Ch.Code art. 1035. Thus, the termination of parental rights is a severe action which requires an onerous burden of proof. State in the Interest of J.M.L., 540 So.2d 1244 (La.App. 3 Cir.1989). In his concurring opinion in State v. Peniston, 235 La. 579, 105 So.2d 228, 232 (1958), Justice Tate eloquently described these principles:
The right of a parent to his child existed before governments or other social institutions of mankind. This natural right proceeds from our Creator and exists independently of the state; the state ... does not in my humble opinion possess the power to take away in favor of a stranger the God-given right of a parent to his child, in the absence of the parents’ forfeiture or abandonment of such right or of positive detriment to the child.
pin his reasons for judgment, the trial judge recognized that CRB and RDL will never be able to act as the primary care givers for their children. Yet he grappled with the dilemma presented by this case: Are the children better off with no parents and the chance to be adopted or with parents who love them but cannot care for them? He wrote:
The parents of these kids are sincere, caring and good people who simply have respective mental and physical handicaps. They cannot be punished (by child removal) simply because of that. As long as they are willing to try and be secondary care givers to their children, they should be allowed to do so. It is not a matter of money or class; it is a matter of preservation of some semblance of family input in their lives. Of course, this is temporary and can change. If these parents knowingly and willingly falter, this matter can be addressed again and parental rights terminated. Only time will tell, and the State can afford to wait in hopes of maintaining a relationship between these kids and their parents, and between the kids themselves. These kids are not presently in danger and are well-adjusted in their respective foster homes. Why uproot them again for the sole purpose of terminating foster care by effectuating the uncertain results of a future adoption of adoptive parents not yet known?
[[Image here]]
Considering the present situation of these kids, though not ideal, it is in their best interest to maintain the status quo and not be jolted by parental termination and uncertain adoption. Certainly, this situation must be monitored and supervised. Any significant changes would warrant addressing the issue of a future involuntary termination of parental rights.
We recognize that the trial judge grappled with this case and is earnestly sincere in his belief that the children’s best interest is not served by the termination of the parental rights of these caring, yet mentally and physically incapable parents. Our review of the transcript reveals not only the trial judge’s consternation, but also the underlying ambivalence of the family welfare professionals who testified at the hearing. Accordingly, we conclude that the State simply did not meet its burden of proof of clear and convincing evidence as required by La.Ch.Code art. 1035.
I/The judgment of the trial court is hereby affirmed. In accordance with La.R.S. *794 13:4521, no costs shall be assessed against the State in this matter.
AFFIRMED.