JjDOUCET, Chief Judge.
EB, the mother of the minor children, SB, HB, RB and MB [1], appeals a judgment of the juvenile division of the district court terminating her parental rights. We affirm the judgment of the trial court.
FACTS
The children of EB, who are the subject to this appeal, were born between August 1990 and April 1995. The children were fathered by three different men, none of whose names appear on their birth certificates. The father of SB is deceased. The father of HB has been served and has taken no action to acknowledge his son or contest the termination. The third man, the father of RB and MB, could not be located.
The mother has a long history of substance abuse, dating back to the 1980’s. She readily admitted that when SB, RB, and MB were born they had cocaine in their systems as a result of her using drugs while she was pregnant. In the latter part of July 1998, the State of Louisiana, Department of Social Services (DSS), Office of Community Services (OCS), received a report that EB’s children were living in squalor. An investigator went to the residence at 1612 N. Adams in Lake Charles and found the house to be without electricity or gas and the children unsupervised. The investigator found that the children slept on bare, torn mattresses on the floor. The house was roach infested and contained very little food. Additionally, mold was observed growing on the kitchen table, windows *918 panes were pushed away from their frame and window screens were torn.
| aOCS attempted to place the children with relatives. This did not work out and on August 12, 1998, the children were adjudicated in need of care and were placed in foster care. A dispositional hearing was held on September 25, 1998, which resulted in the court ordering that the children remain in the care of OCS and that their mother comply with the OCS case plan. Thereafter, on November 10, 1999, DSS filed a petition for termination of parental rights and sought to have the children certified for adoption. The matter did not come to trial until December 21, 2000. Judgment in favor of DSS was rendered in written reasons rendered on February 2, 2001. A formal judgment was signed February 16, 2001. Ms. B, the mother, appeals that judgment.
LAW AND DISCUSSION
In State in the Interest of S.M.W., C.D.W., C.N.W., and E.S.W., 00-3277, pp. 12-14, (La.2/21/01), 781 So.2d 1223, 1232-33, our supreme court discussed the law applicable to this case:
Title X of the Children’s Code governs the involuntary termination of parental rights. As applicable to this case, the grounds for termination of parental rights are:
(5) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent’s custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent’s condition or conduct in the near future, considering the child’s age and his need for a safe, stable, and permanent home.
La. Children’s Code Art. 1015(5). The method of proving these elements is provided in La. Children’s Code Art. 1036. La. Children’s Code Art. 1036(C) and (D) provide:
|3(C) Under Article 1015(5), lack of parental compliance with a case plan may be evidenced by one or more of the following:
(1) The parent’s failure to attend court-approved scheduled visitations with the child.
(2) The parent’s failure to communicate with the child.
(3) The parent’s failure to keep the department apprised of the parent’s whereabouts and significant changes affecting the parent’s ability to comply with the case plan for services.
(4) The parent’s failure to contribute to the costs of the child’s foster care, if ordered to do so by the court when approving the case plan.
(5) The parent’s repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.
(6) The parent’s lack of substantial improvement in redressing the problems preventing reunification.
(D) Under Article 1015(5), lack of any reasonable expectation of significant improvement in the parent’s conduct in the near future may be evidenced by one or more of the following:
(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert *919 opinion or based upon an established pattern of behavior.
(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.
(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.
[/The State must prove the elements of one of the enumerated grounds by clear and convincing evidence to sever the parental bond. La. Children’s Code art. 1035(A); Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (holding that the minimum standard of proof in termination of parental rights cases in clear and convincing evidence); State ex rel. J.A., supra [99—2905 (La.1/12/00), 752 So.2d 806] at 811. The State must only establish one statutory ground for termination, but the trial judge must also find that termination is in the best interest of the child. La. Children’s Code art. 1039; State ex rel. J.A., supra.
“It is well-settled that an appellate court cannot set aside a juvenile court’s findings of fact in the absence of manifest error or unless those findings are clearly wrong.” In re A.J.F., 00-0948 (La.6/30/00), 764 So.2d 47, 61. “Where there is conflicting testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even when the appellate court may feel that its own evaluations and inferences are as reasonable as those of the trial court.” Id.; Rosell v. ESCO, 549 So.2d 840 (La.1989).
“[I]f the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.” Rosell, supra at 844. “Where there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong.” Id. “In its manifest error review, it is important that the appellate court not substitute its opinion when it is the juvenile court who is in the unique position to see and hear the witnesses as they testify.” In re A.J.F., supra at 62. “The trier of fact is not disadvantaged by the review of a cold record and is in a superior position to observe the nuances of demeanor evidence not revealed in a record." Id.
The record confirms that more than one year elapsed between the time the children were placed in foster care and the time DSS filed for termination. Upon being placed in foster care, the children were described as not being “house-broken.” The foster parents reported that the children would eat with their hands, steal food, horde food, use towels as toilet tissue, walk on furniture and behave aggressively toward each other as well as toward other children. These reports were substantiated by their case workers and by Dr. Patricia Post, a psychologist who interviewed, tested and evaluated the children.
|RPr. Post found that all of the children were in need of close supervision and extensive support. SB was found to elicit many characteristics of antisocial behavior. She had begun to parent her younger siblings, including the use of physical aggression to discipline her younger brothers. It was also noted that she would lie and steal without remorse.
*920 HB was found to have learning difficulties and in need of close supervision in completing school assignments and probably in need of extra tutoring. Dr. Post found HB to be “at risk for the development of an anxiety disorder” and concluded: “Reassurance of Ms positive traits as well as placement within a home that is consistent in terms of rules and structure will be crucial for his further development.”
Dr. Post found RB to have significant impairment in his Communication and Socialization Domains and very poorly socialized due to a lack of supervision and neglect. RB, who was very impulsive and aggressive, was diagnosed with ADHD and Disruptive Behavior Disorder and was placed on medication to help control these conditions. Because of his disorders, RB was found to be in need of extensive, close supervision.
According to Dr. Post’s report, MB’s foster mother expressed concerns about “M[_,]’s intellectual development, speech and language development, tendencies to overeat, toileting habits and difficulty in communicating when stressed.” At preschool, it was noted that MB substituted “T” sounds for “C” sounds, “D” sounds for “TH” sounds and that he was overly aggressive with his classmates. Dr. Post noted that during visits with his mother, MB showed a marked lack of attachment to her.
In conclusion, Dr. Post stated that “these children [... ] very much need a | ^stable and consistent placement and the ability to develop appropriate attachments with adult figures.”
Turning now to the mother, appellant, EB, we note that she has gotten “clean” on at least five prior occasions, but has always relapsed after various periods of time, the longest being approximately one year. On at least two of those occasions, her relapse has been directly related to some stressful event, i.e., the death of her mother and her sustaining a broken leg. At the time the children were taken into protective custody, EB was using 6 to 7 “rocks” of cocaine and approximately 5 quarts of alcohol daily. She also used marijuana on an infrequent (about once a week) basis. Ms. B failed to explain where she obtained the money to buy her drugs and alcohol. In the December after the children were taken, Ms. B did complete a parenting course. However, she has attended no counseling or parenting classes since that time. Additionally, by her own admission, she continued to use drugs and alcohol. In fact, on March 17, 2000, just two days after a postponed hearing, she tested positive for cocaine. Ms. B. claims that she has been “clean” since then. However, the record contains no drug tests results between March and October 2000. Ms. B took several tests in October, all of which were negative for illicit drugs.
Ms. B testified that sometime in 1999, she obtained employment in the housekeeping department of a Lake Charles motel. She stated that she has maintained that employment since then, and that she has been promoted to housekeeping supervisor. Her major daughter, FB, corroborated EB’s testimony, but no evidence from EB’s employer was introduced.
|7The social worker who supervised EB’s visits with her children testified that EB had still not learned how to parent her children, leaving any disciplining of the children to the foster parents, who were also present at the visits.
Dr. Ann Menou, a clinical psychologist who testified at trial, evaluated EB in 1998 and saw her again in August 2000. Dr. Menou was of the opinion that EB probably couldn’t cope with the stresses of parenting as evidenced by her past relapses *921 and by the results of Parenting Stress Index Test administered at her August 2000 visit.
In terminating Ms. B’s parental rights, the trial judge stated the following:
At the time of the filing of the petition for termination of parental rights all of the factors required by Article 1015(5) of the Children’s Code were present. Since March of 2000 the mother has by her testimony, been clean from drug use since March 2000 [sic]. As previously stated, the only drug test done on the mother between the month of March 2000 to October 2000 were those done on October 5, 10, 11, and 17 of 2000. She has completed the ADAC program for drug dependent individuals. Food Stamps have been obtained, she, has a job and is living in Section 8 housing, which she secured 8 or 9 months ago. Parenting classes were attended and a certificate of completion was filed in the record, indicating a completion date of December 23,1998.
The Court will address paragraph 5 of the petition:
1-The parent did repeatedly fail to comply with required programs of treatment and rehabilitation services;
2-The parent lacks substantial improvement in redressing the problems preventing re-Unification [sic] (Note: any redressing of problem was only done since March 2000, Nineteen months after removal from the mother)[;]
3-All of the elements of removal were present until March 2000.
4-The parent has entered and completed substance abuse treatment and passed the only drug test taken. (Note: Completion of ADAC would make it the seventh drug re-hab program completed by the mother. There were no Isdrug test[s] submitted in the record. However, testimony showed that 2 days after a continuance was granted for a trial on March 15, 2000 the mother tested positive for cocaine).
5-The mother has maintained the same residence for the last 8 to 9 months.
The court will now address paragraph six of the “Petition to Terminate Parental Rights”:
1-The mother has established a permanent residence for 8 to 9 months but from the expert testimony would not be able to provide the structure needed for these children.
2-Although the mother has been in a permanent residence for 8 to 9 months it is questionable, through expert testimony, that it will be suitable for the children.
3-The ... [children’s] condition would require extended periods of consistent, highly motivated participation in treatment which, thus far, the parent has not exhibited.
4-The children are now two years older than when they entered care and have been in DSS/OCS custody for two years. The children need a stable and permanent home and it would not be in the best interest of the children to wait any longer for their mother to rehabilitate.
In the case of State ex rel. M.S., 99-2190, pp. 3, 4 (La.App. 4 Cir. 6/23/00), 768 So.2d 628, 631, our brethren of the fourth circuit reminded us of the following:
In any case to involuntarily terminate parental rights, there are two private interests involved: those of the parents and those of the child. The parents have a natural, fundamental liberty interest to the continuing companionship, care, custody and management of their *922 children warranting great deference and vigilant protection under the law, State ex rel. J.A., 99-2905 (La.1/12/00), 752 So.2d 806; Lassiter v. Department of Soc. Servs., 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640(1981), and due process requires that a fundamentally fair procedure be followed when the state seeks to terminate the parent-child legal relationship, State ex rel. J.A., supra; State in Interest of Delcuze, 407 So.2d 707 (La.1981). However, the child has a profound interest, often at odds with those of his parents, in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, and continuous relationships found in a home with proper parental care. State ex rel. J.A., supra; Lehman v. Lycoming County Children’s Services Agency, 458 U.S. 502, 102 S.Ct. 3231, 73 L.Ed.2d 928 (1982); see also State in the Interest of S.M., 98-0922 (La.10/20/98), 719 So.2d 445, 452. In balancing these interests, the courts of this state have consistently found the interest of the child to be paramount over that of the parent. State ex rel. J.A., supra; See, e.g., State in the Interest of S.M., 719 So.2d at 452; State in the Interest of A.E., 448 So.2d 183, 186 (La.App. 4 Cir.1984); State in the Interest of Driscoll, 410 So.2d 255, 258 (La.App. 4 Cir.1982).
[[Image here]]
The State need only establish one ground, Louisiana Children’s Code art. 1015, but the judge must also find that the termination is in the best interest of the child. Louisiana Children’s Code art. 1039. State ex rel J.A., supra; See State in Interest of M.L. & P.L., 95-0045 (La.9/5/95), 660 So.2d 830, 832. Additionally, the State must prove the elements of one of the enumerated grounds by clear and convincing evidence to sever the parental bond. Louisiana Child Code art. 1035(A); State ex rel J.A., supra; Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (holding that the minimum standard of proof in termination of parental rights cases is clear and convincing evidence.).
In the case sub judice, we find that the State proved by clear and convincing evidence: (1) the children’s need for a safe, stable, and permanent home; (2) that their mother had faded to demonstrate that she was capable of parenting these four children, with their special needs; and (3) that it would be in the best interest of the children to terminate Ms. B’s parental rights in order to give the children then-best chance at a “normal” life. We also find the fact that Ms. B failed in her six prior .attempts to stay away from illicit drugs further supports the trial judge’s decision.
Accordingly, for the reasons stated, the judgment of the juvenile court is affirmed. In as much as Ms. B is a pauper, we pretermit the assessment of costs.
AFFIRMED.

. The record reveals that L"F”B’s correct name is FAB. FAB reached majority before this case came to trial, and hence, she was no longer a party to the proceedings.